**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - -X
MOKHTAR HAOUARI,                          :
                                          :
                    Petitioner,           :
                                          :
        -against-                         :      04 Civ. 4502(JFK)
                                          :      00 Cr. 15 (JFK)
                                          :      **OPINION and ORDER**
                                          :
UNITED STATES OF AMERICA,                 :
                                          :
                    Respondent.           :
- - - - - - - - - - - - - - - - -X

**APPEARANCES**:


        **For Petitioner Mokhtar Haouari:**

            JOYCE C. LONDON, ESQ.
              20 Vesey Street, Suite 400
              New York, New York 10007


        **For Respondent United States of America:**

            DAVID N. KELLEY,
              United States Attorney for the
              Southern District of New York
              One Saint Andrew's Plaza
              New York, New York 10007
              Of Counsel:  AUSA Michael Farbiarz
                           AUSA Robin L. Baker

**JOHN F. KEENAN, United States District Judge**

**JOHN F. KEENAN, United States District Judge**:

Before the Court is the petition of Mokhtar Haouari ("Haouari") to vacate his conviction pursuant to 28 U.S.C. § 2255. For the reasons that follow, the petition is denied.

## BACKGROUND

## I.    PROCEDURAL HISTORY

This case involves the so-called "Millennium Plot" to bomb Los Angeles International Airport ("LAX") in late December 1999. On April 11, 2001, Haouari was charged in seven counts of the fourth superseding indictment filed in connection with this matter. Count One charged Haouari under 18 U.S.C. § 371 with conspiracy to provide material support and resources to terrorists (18 U.S.C. § 2339A), to commit arson and bombing of a building in interstate commerce (18 U.S.C. § 844(i)) and to commit terrorist acts transcending international boundaries (18 U.S.C. § 2332b(a)(1)(B)). Count Two charged him under 18 U.S.C. §§ 2339A and 2 with providing material support and resources to terrorists to be used for arson and bombing of a building in interstate commerce (§ 844(i)) and terrorist acts transcending international boundaries (§ 2332b(a)(1)(B)). Count Three charged him under 18 U.S.C. § 371 with conspiracy to commit bank fraud and fraud involving access devices and identification documents (18 U.S.C. §§ 1028(a)(2), 1028(a)(7), 1029(a)(2), 1029(a)(5) and 1344). Counts Four and Five charged him under 18 U.S.C. §§

1028(a)(2), 1028(a)(7) and 2 with identification document fraud.

Counts Six and Seven charged him under 18 U.S.C. §§ 1029(a)(2),

1029(a)(5) and 2 with access device fraud.

Trial commenced on June 26, 2001.  Before the case went

to the jury, the Government agreed to withdraw those portions of

Counts One and Two that rested on the commission of terrorist

acts transcending international boundaries (§ 2332b(a)(1)(B)).

The Government also agreed not to proceed on Count Seven.  On

July 13, 2001, the jury convicted Haouari on Count One and Counts

Three through Six.  He was acquitted on Count Two.[1]  On January

16, 2002, the Court sentenced Haouari to the following

consecutive terms of imprisonment: 60 months on Count One, 60

months on Count Three, 36 months on Count Four, 36 months on

Count Five and 96 months on Count Six.  The total sentence was 24

years, or 288 months.

Haouari filed a timely appeal.  On January 27, 2003,

the Second Circuit affirmed his conviction and sentence.  United

States v. Meskini, 319 F.3d 88 (2d Cir. 2003).  The Circuit's

primary concern was Section 3A1.4 of the Sentencing Guidelines

("Guidelines"), which specifies an increase in both offense level

and criminal history level for felonies involving or intending to

promote terrorism.  Haouari had argued that this Court's

---

[1] Haouari incorrectly states on page 2 of his memorandum of
law that he was convicted only on Counts One, Three and Four.

application of Section 3A1.4 at sentencing resulted in impermissible double counting.  The Circuit rejected this argument.  Id. at 91-92.  The Circuit weighed Haouari's remaining claims and found them without merit.  Id. at 92.  Some of these claims resurface in the instant § 2255 petition.  On May 27, 2003, the Supreme Court denied Haouari's application for a writ of certiorari.  Haouari v. United States, 538 U.S. 1068, 123 S. Ct. 2240, 155 L. Ed. 2d 1125 (2003).

## II. **FACTS**

The evidence at trial established that Haouari, Abdelghani Meskini ("Meskini") and Ahmed Ressam ("Ressam") conspired to bomb LAX.  The plot unraveled on December 14, 1999, when Ressam was caught with explosives in his car at the border station in Port Angeles, Washington.  The evidence included the testimony of Ressam and Meskini; the testimony of law enforcement personnel; physical evidence seized from the three conspirators; telephone, credit card and bank records; and recorded conversations between Haouari and Meskini after Ressam's arrest.

### A. **Pre-Millennium Plot Activities**

In 1994, Haouari met Ressam, a fellow Algerian, in Montréal. (SA 405-09.)[2]  Between 1996 and 1997, Ressam sold Haouari stolen identification documents, charge cards and a phony

---

[2] Citations are to the Supplemental Appendix filed in connection with Haouari's direct appeal.

4

Canadian passport. (SA 410-11, 499-500.)  In 1998, Ressam left for Afghanistan to attend terrorist training camps. (SA 415-16.)

Months before Ressam's departure, Haouari had met up with Meskini, another Algerian, who had arrived in Montréal in October 1997. (SA 87-90.)  On various occasions between 1997 and 1999, Haouari provided Meskini with fake Canadian passports and other forms of identification, some of which Meskini used to commit bank and credit card fraud. (SA 111-98, 234-36.)  By July 1999, Meskini had settled in Brooklyn, New York. (SA 165.)  The next month, Haouari and Meskini conversed about an Algerian man who would be coming to New York to meet some people.  Haouari said that the man "used to be in Bosnia," which Meskini understood to mean that he had participated in jihad. (SA 229-32.)  Haouari asked Meskini if the man could stay with Meskini in his apartment. (SA 229-30.)  Meskini agreed, but the visit never came to pass. (SA 231.)  The man was Ressam.

From about April 1998 until 1999, Ressam attended terrorist training camps in Afghanistan.  He received instruction in light weapons, the making and use of explosive devices, sabotage, target-selection, urban warfare, tactics (including assassination), security and the use of poisons and poisonous gas. (SA 418-27, 488-94, 506-07, 550-52.)  In early 1999, Ressam returned to Canada. (SA 427.)  He carried with him chemical substances, a notebook containing instructions on making

explosives and $12,000 in cash. (SA 429.)  At this time, Ressam
devised his plan for bombing LAX during the Millennium
celebration.  He secured identification under the alias "Benni
Noris," obtained bomb ingredients and components, and made
several powerful explosives and four timing and power units for
an explosive device. (SA 438-39, 452-54, 459-65, 469-76, 482-87.)
By the summer of 1999, Ressam wanted to obtain a credit card.  He
contacted Haouari and asked if he could "pretend [to be] working"
in Haouari's store, Artisanat Nord-Sud, in order to qualify for a
credit card.  Haouari agreed. (SA 431-32.)  He filled out an
application for Ressam under the latter's alias, "Benni Noris."
(SA 431-32, 478-79.)  Ressam received the credit card.  He was
carrying this card on the day that he was arrested. (SA 480-82.)

B.    **The Planning of the LAX Attack**

In October 1999, Ressam discussed with Haouari the
possibility of an "operation" against the "biggest enemy," the
United States. (SA 436.)  Referring to the bombings of the
American embassies in Nairobi, Kenya and Dar es Salaam, Tanzania
on August 7, 1998, Ressam opined that it would have been
preferable to have carried out the bombings inside the United
States. (SA 458-59.)  Ressam testified that Haouari "[g]enerally
speaking ... was in agreement." (SA 459.)  In late October or
early November 1999, at the request of Haouari and others, Ressam
agreed to open a store in Montréal under his alias.  Ressam's

6

store would be used as a source of credit card and bank card information for fraudulent activities. (SA 433-35, 463, 468, 476.) Haouari said that after four to six months of receiving proceeds from this store, he was "interested" in going to Afghanistan, as Ressam had done. (SA 435-36.)

In late October or early November 1999, Haouari told Ressam that he had "a friend" in the United States who was "very eager to join the jihad." (SA 434-35.) This was Meskini. Ressam replied that, if Haouari knew the friend very well and trusted him, it would not be a problem to get him a visa. (SA 435.)

At the beginning of November, Ressam told Haouari to give him some money from the store for "some important business" in the United States. (SA 447.) A few days later, Haouari gave Ressam $3000 CAD. (SA 448-49.) Haouari offered to connect Ressam with his "friend" (Meskini). Ressam replied, "Mokhtar, I'm not going to America for tourism. I am going on some very important and dangerous business." Haouari told Ressam that it was "no problem," that his friend was involved in bank fraud and that the friend could help him. Ressam asked Haouari to talk to the friend and explain the matter "very well" to him. (SA 447-49.) Ressam testified at trial that he told Haouari that the work was "dangerous" so that Haouari would "know what kind of work" Ressam would be doing. Ressam conveyed the nature of the work, but he withheld the exact target from Haouari "for security reasons."

(SA 448.)  Haouari told Ressam, "My friend Abdelghani [Meskini] will help you."  Ressam replied, "Mokhtar, did you explain to him well the business in this work?"  Haouari assured Ressam that Meskini had been informed about the "business." (SA 449.)

###### C.  **Initial Preparations**

Around the time of the foregoing conversation with Haouari, Ressam called friends in Afghanistan and Great Britain in order to obtain visas for Meskini and another friend who helped prepare for the attack.  (SA 430, 446, 450, 461, 471-72.) When Ressam received the blank visas, he gave them to Haouari to fill them in and make stamps for them. (SA 450-51.)  Haouari then made a phony Québec driver's license that Ressam said he needed. (SA 452-53, 459, 534-35, 542-43.)  Haouari also agreed to provide Ressam with an Algerian passport so that Ressam could return to Algeria after he was "through with America." (SA 452-54.)  Ressam planned to pick up the passport in Montréal upon his return from the United States. (SA 453-54, 475-76, 534-35.)

Around November 17, 1999, Ressam flew from Montréal to Vancouver. (SA 459-60.)  He said that he would call Haouari and let him know when to contact his friend (Meskini). (SA 461.) Ressam combined the $3000 CAD he had received from Haouari with money he already had.  He bought chemicals, instruments and airline tickets with the money.  He also rented a car and paid for a hotel room. (SA 461-62, 565-66.)  For two weeks, Ressam

stayed in Vancouver and prepared the chemical materials for the explosives. (SA 460-61.)

On November 21, 1999, Haouari informed Meskini by phone that he had three visas to Pakistan. Haouari explained that a friend (Ressam) had obtained the visas upon learning from Haouari that Meskini wanted to perform jihad in Afghanistan. Meskini wanted the visa. He also needed a passport in order to get to Afghanistan. Haouari agreed to obtain the passport. On or about November 22, 1999, Meskini sent his picture to Haouari. Over the next several days, Meskini made follow-up calls to Haouari about the passport. In early December, Meskini called the Pakistan International Airline for flight information. (SA 232-37.)

D.    **"The Fire is On and It's Coming"**

By the beginning of December 1999, Ressam had returned to Montréal. On his first day back, he met Haouari at the store they were opening. Ressam said that he wanted to meet Haouari's friend in Seattle in one week. He directed Haouari to tell the friend that Ressam would use the name "Reda." He added that upon the friend's arrival, Ressam would explain the precise nature of the job. (SA 462-63.) Haouari called Meskini and asked him if he remembered his mentioning a man who would be coming to New York. Meskini did. Haouari asked Meskini to meet that man in Seattle and to give him $1500 to $2000. Haouari added that he had told the man that Meskini lived in the United States and committed

bank fraud.  When Meskini asked the man's name, Haouari with some
trepidation told him to call the man "Reda."  Haouari suggested
that Meskini rent a car with his fake driver's license for "Reda"
and drive him around while he was in Seattle.  Meskini agreed to
do what Haouari asked him.  He told Haouari to give "Reda" his
pager and cellular phone numbers. (SA 240-46.)

Ressam thereafter visited Haouari at his home.  Haouari
explained that his friend was named "Ghani."  He showed Ressam a
picture of Meskini and gave Ressam Meskini's contact information.
(SA 463-65.)  Ressam telephoned Meskini on December 4, 1999.
Ressam introduced himself as "Reda, Mokhtar's friend."  The two
agreed to meet in Seattle on December 12, 1999. (SA 252-54, 465.)
Meskini related the conversation to Haouari.  Meskini said that
he would go to Seattle on December 11.  Haouari replied that
Ressam had said that Meskini "would have a great blessing."
Haouari passed the phone to a fraud co-conspirator, who spoke to
Meskini.  While making arrangements with this conspirator,
Meskini overheard Haouari say, "Tell him the fire is on and it's
coming."  Meskini testified that this comment, along with
Haouari's other remarks and discussions about Ressam, led him to
conclude that Ressam was coming to the United States "to commit
some violent act." (SA 254-259.)

In a subsequent meeting with Haouari, Ressam used a pay
phone to call Abu Doha, his friend in Great Britain.  Ressam had

contacted Doha, an important figure in Afghanistan, for the Pakistan visas. (SA 423, 450-52, 465-68, 570.) Referring to Haouari as "Omar" and Doha as "Rachid," Ressam introduced the two men over the phone. Ressam told Doha, "If I'm not here, if this friend calls you, it would be the same. He would send you names of people who want to go to Afghanistan." (SA 466-67, 570.) Ressam previously had told Haouari that this man would know his whereabouts so that Ressam could be contacted and paid his share of the proceeds from the store. (SA 465-66.)

###     E.    **The Plot Unravels**

On or about December 8, 1999, Ressam left Montréal and headed back to Vancouver. Once there, he began preparing the explosives. (SA 469-72.) He never spoke to Haouari again. On December 11, Meskini -- who had purchased a round trip New York-to-Seattle airline ticket under the alias "Eduardo Rocha" -- flew to Seattle. (SA 260-62.) Upon his arrival, Meskini called Haouari to alert him that, if "Reda" called, Haouari should tell him that Meskini was waiting in Seattle. (SA 262-63.) Although their meeting was scheduled for December 12, Meskini did not speak with Ressam that day. Meskini had left his pager in New York and thus failed to get the message Ressam had left on it ("Abdelghani, do not be concerned. I am Reda. I will call you later."). (SA 263-65, 472.) Meskini told Haouari that Reda had not shown. Haouari advised Meskini to "be patient." (SA 265.)

On December 14, 1999, Ressam called Meskini and said, "This evening, I will be in Seattle. I'll call you." (SA 266, 472-73.) Ressam then left Vancouver in a rental car with the explosives loaded in the trunk. He took an auto ferry to Victoria and then another ferry to Port Angeles, Washington. When Ressam arrived in Port Angeles, the border patrol began a search of his car and its trunk. Ressam then fled, but he was chased, caught and arrested. (SA 473-74.) His plan, had he not been arrested, was to meet Meskini, put the explosives into suitcases and take them by train to Los Angeles. Ressam wanted to use a train rather than the car because the explosives were sensitive to impact. (SA 475.) Once in Los Angeles, Ressam and Meskini would "check the airport out." (SA 474-75.) After the attack, Ressam planned to return to Montréal, pick up the Algerian passport from Haouari, and then proceed to Algeria via Europe. (SA 452-54, 475-76, 534-36.)

After Ressam failed to arrive in Seattle, Meskini called Haouari several times on December 14 and 15. Haouari said that he had been calling "Reda" but had only reached voice mail. (SA 267-69.) Meskini returned home to Brooklyn on December 16. (SA 271.) The next day, Meskini spoke by phone with Haouari, who was in Montréal. Haouari instructed Meskini to change his telephone numbers and dispose of his fake identification and credit cards. He added that Meskini should not call him in the

foreseeable future, but that if it were truly necessary, Meskini should call a mutual friend in Algeria to get Haouari's new telephone number. (SA 272-73.) On December 18, Meskini heard media accounts of Ressam's arrest. He did not know, however, that Ressam was "Reda." He ignored Haouari's instructions and tried unsuccessfully to reach him by phone. (SA 274-75.)

On December 22, 1999, Meskini made a cellular phone call to Haouari. At 11:27 P.M., Haouari called Meskini on the latter's residential telephone. (SA 275-79.) The FBI, with court authorization, had just begun to monitor Meskini's phone. Meskini asked, "Listen. Was that woman your cousin?" (SA 281.) Meskini testified that he and Haouari often spoke in code. (SA 203.) This question was Meskini's way of asking whether Ressam and "Reda" were the same person. (SA 283.) Haouari replied, "Yes." (SA 281.)

Meskini was arrested on December 30, 1999. (SA 70.) He was arraigned in this district on January 20, 2000. After extradition proceedings, Haouari was arraigned in this district on August 14, 2000. On March 7, 2001, Meskini pleaded guilty to eight counts in the indictment. Approximately one month later, Ressam was convicted at his own trial in the Western District of Washington of nine counts related to terrorism, transporting explosives and other matters. Ressam's trial was held in Los Angeles due to pretrial publicity concerns in the Seattle area.

(SA 402.)  Both Ressam and Meskini testified at Haouari's trial in New York.

## DISCUSSION

Haouari supports his § 2255 petition with several "Grounds."  Some of the Grounds contain multiple subparts. Haouari concedes on page 2 of his memorandum of law that the Second Circuit decided the following claims on appeal: Ground One, subparts (2) and (4)-(8), and Grounds Three through Seven in their entirety.  It is settled that "section 2255 may not be employed to relitigate questions which were raised and considered on direct appeal."  Cabrera v. United States, 972 F.2d 23, 25 (2d Cir. 1992).  The Court accepts Haouari's concession and focuses its analysis on the remaining claims: Ground One, subparts (1) and (3), and Ground Two.  These arguments are addressed to ineffective assistance of counsel.

Haouari also attacks the constitutionality of his sentence in light of Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004), and United States v. Booker, 543 U.S. 220, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005).  Blakely and Booker had not been decided when the Circuit affirmed Haouari's conviction in 2003.

## I.    INEFFECTIVE ASSISTANCE OF COUNSEL

Haouari raises "new matters" concerning ineffective assistance of counsel that "require[] examination of matters that were outside the District Court record." (Pet. Mem. of Law at 10.)  He seeks "to supplement the record with documentation not previously presented either at trial or on appeal." (Id.) Haouari characterizes the new grounds as follows:

> (1) Trial counsel's misadvice and coercion of Haouari not to testify at trial, thereby waiving his constitutional right to testify on his own behalf at trial, see Petition Ground One (1); and

> (2) Trial counsel's concession and failure to contest at trial Haouari's guilty [sic] of the fraud-related offenses charged in the Indictment, all without Haouari's consent, see Petition Ground One (3).

(Id. at 11.)  These are Ground One, subparts (1) and (3). Haouari contends in Ground Two that his appellate counsel was ineffective for failing to raise Ground One, subparts (1) and (3) on appeal. (Id. at 14.)  He claims that a hearing is necessary to resolve these issues. (Id. at 12, 14.)

A defendant may raise an ineffective assistance of counsel argument for the first time on collateral attack.  See Massaro v. United States, 538 U.S. 500, 509, 123 S. Ct. 1690, 1696, 155 L. Ed. 2d 714, 723 (2003).  The analysis for ineffectiveness of counsel is the two-prong test found in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  First, the Court determines "whether, in

15

light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Id. at 690, 104 S. Ct. at 2066, 80 L. Ed. 2d at 695. Second, the Court determines whether the defendant has shown "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S. Ct. at 2068, 80 L. Ed. 2d at 698.

### A. Haouari's Failure to Testify

Haouari argues that he wanted to testify at trial, but his counsel, Daniel Ollen, Esq., forced him to stay off the witness stand. Haouari has submitted an affidavit with his moving papers. He claims:

> In the days and weeks before my trial and during the trial itself, I told my lawyer that I wanted to testify on my own behalf.
>
> Mr. Ollen told me that was O.K., but he never did anything to prepare me for my testimony.
>
> At the close of the Government's case, I again told Mr. Ollen that I wanted to testify.
>
> Mr. Ollen told me that I must not testify because he was sure that we had already won the case on Counts One and Two (the terrorism counts).
>
> He assured me very strongly that there was no way the jury could find me guilty on those counts.
>
> As a result of his insistence, I did not testify.

(Haouari Aff., Oct. 21, 2004, ¶¶ 3-8.) Mr. Ollen has submitted his own affidavit in response to Haouari's. Mr. Ollen states:

> I ... had extensive pre-trial conversations with
> Haourai [sic][3] with regard to whether he should
> testify.  I advised him that, in my view,
> testifying on his own behalf was not a good idea.
> As I explained to Haourai, given the volume of
> fraud-related evidence that the Government had, it
> would be difficult for the jury to see Haourai as a
> credible witness.  I explained all this to Haourai,
> and he agreed that he should not take the stand in
> his defense.

(Ollen Aff., Feb. 7, 2005, ¶ 3.)  Haouari disputes Mr. Ollen's

account, claiming that his counsel's "repeated exhortations for

[Haouari] not to testify crossed the line and were coercive."

(Pet. Reply Mem. of Law at 14-15.)

Assuming that Haouari's affidavit is true, there has

been no demonstration of coercion or incompetence on Mr. Ollen's

part.  The affidavit shows only that (1) Haouari discussed with

counsel whether or not he should testify, (2) counsel strongly

advised him against it and gave reasons for this advice, and (3)

Haouari made the decision not to testify as a result of counsel's

"insistence."  Mr. Ollen's advice to Haouari was a plausible

strategic choice and not coercive.  Even though the ultimate

decision lies with the defendant, "counsel should always advise

the defendant about the benefits and hazards of testifying and

not testifying, and may strongly advise the course that counsel

thinks best."  Brown v. Artuz, 124 F.3d 73, 79 (2d Cir. 1997).

---

[3] Haouari's name is misspelled "Haourai" throughout Mr.
Ollen's affidavit.

This is what Mr. Ollen did here, and properly so.  But in any event, Mr. Ollen's affidavit is completely credible.

In addition, as the Government recognizes, Haouari shows no prejudice resulting from his failure to testify.  See Brown, 124 F.3d at 80. (Gov't Mem. of Law at 59.)  Haouari does not explain what he would have said had he been called to testify or how this testimony might have changed the outcome of the case. In light of the strong evidence at trial against him, discussed supra pp. 4-13, Haouari's failure to address the issue of prejudice undermines his Strickland claim.  Without a showing that he was prejudiced by Mr. Ollen's alleged refusal to put him on the stand, Haouari is not entitled to habeas relief on this issue.

To the extent that there are factual differences between Haouari's affidavit and Mr. Ollen's affidavit, a hearing is not necessary to resolve them.  Section 2255 requires the Court to hold a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C. § 2255.  In this case, further testimony at a hearing would add nothing to the affidavits or other written submissions and would waste the time and resources of the Court, the Government and Haouari's trial counsel.  See Chang v. United States, 250 F.3d 79, 86 (2d Cir. 2001).

## B.  Haouari's Failure to Contest the Fraud Charges

Haouari's second ineffective assistance argument is that his trial counsel "never obtained [Haouari's] consent to undertake a defense in which counsel conceded and failed to contest at trial [Haouari's] guilt of fraud-related offenses in the Indictment." (Pet. Mem. of Law at 12.)  Haouari contends that Mr. Ollen "never discussed ... that he was going to concede my guilt on the fraud charges." (Haouari Aff., Oct. 21, 2004, ¶ 9.) Haouari claims that he was "shocked" when his counsel told the jury that they should convict on the fraud charges. (Id. ¶ 10.) Mr. Ollen's recollection of the events, not surprisingly, is somewhat different:

> Prior to trial, I had extensive discussions with Haourai with regard to strategic issues.  In particular, I explained to Haourai that, in my view, the wisest course for him was not to contest the Government's fraud charges –– and to focus only on the Government's terrorism-related charges.  As I explained to Haourai, the Government's evidence as to the fraud charges was much stronger than its evidence on the terrorism charges.  Moreover, the terrorism charges carried much more serious possible sentencing consequences than the fraud charges.  In these circumstances, I believed that it was important that Haourai pick his battle –– and contest only the terrorism-related charges.  I explained all this to Haourai, and he agreed that I should concede his guilt on the fraud charges, and focus on defending against the terrorism charges.

(Ollen Aff., Feb. 7, 2005, ¶ 2.)  Again, the Court finds that a hearing is not necessary to resolve the factual inconsistencies

between the two affidavits.  Mr. Ollen's detailed affidavit is
far more credible than Haouari's generic assertions.

Mr. Ollen's advice to Haouari was not unreasonable.  As
the Government points out, the evidence of fraud against Haouari
was overwhelming.  The evidence on the terrorism counts arguably
was less so.  (Gov't Mem. of Law at 56.)  In fact, Haouari was
acquitted of Count Two, one of the terrorism charges.  Mr. Ollen
employed a plausible trial strategy in conceding guilt on the
fraud counts, and the Court will not second-guess it.
See Farrington v. Senkowski, 214 F.3d 237, 244 (2d Cir. 2000)
(finding no Strickland violation when defendant's attorney
conceded guilt on attempted larceny charge in order to persuade
jury to acquit on more serious felony murder and attempted
robbery charges).  Mr. Ollen's affidavit establishes to the
Court's satisfaction that Haouari was aware of this strategy and
agreed with it.  Moreover, the strength of the Government's
evidence on the fraud charges demonstrates that Haouari was in no
way prejudiced by his decision to concede guilt as to those
charges.

### C.  Appellate Counsel's Failure to Raise Trial Counsel's Alleged Ineffectiveness

In Ground Two of his § 2255 motion, Haouari claims that
his appellate counsel, Martin C. Goldberg, Esq., was ineffective
for not raising on appeal the ineffectiveness of Mr. Ollen with
respect to Haouari's failure to testify and the concession of

guilt on the fraud charges. This argument became somewhat lost
in the shuffle of the briefing on this motion. It is mentioned
once in Haouari's memorandum of law (p. 14), but not at all in
the Government's brief or Haouari's reply brief.

The Court already has found meritless Haouari's
contention that Mr. Ollen was ineffective for persuading him not
to testify and conceding guilt on the fraud charges. It would be
illogical for the Court to order a hearing to gather evidence on
whether appellate counsel was ineffective for not raising these
meritless arguments on appeal. In the appellate context, "only
when ignored issues are clearly stronger than those presented,
will the presumption of effective assistance of counsel be
overcome." Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994)
(citing Gray v. Greer, 800 F.2d 644, 646 (7th Cir. 1985)). Such
was not the case here.

Haouari also fails to show prejudice from the alleged
ineffectiveness. "To establish prejudice in the appellate
context, a petitioner must demonstrate that 'there was a
"reasonable probability" that [his] claim would have been
successful before the [appellate court].'" Mayo, 13 F.3d at 534
(quoting Claudio v. Scully, 982 F.2d 798, 803 (2d Cir. 1992)).
Having considered the affidavits of Haouari and Mr. Ollen, the
Court finds no reasonable probability that Haouari's argument
would have succeeded on appeal. Haouari argues in his brief that

the prejudice is a "procedural bar preventing a full review of [the] Sixth Amendment claim." (Pet. Mem. of Law at 11.) Haouari misstates the law. There is no procedural default for failure to raise ineffectiveness claims on direct appeal. <u>Massaro</u>, 538 U.S. at 503-04, 123 S. Ct. at 1693, 155 L. Ed. 2d at 719. Haouari is entitled to, and is getting, a full airing of his Sixth Amendment claims in the instant motion.

The Court thus rejects Haouari's arguments that his trial and appellate counsel were ineffective.

## II. SENTENCING

Pursuant to Section 3A1.4 of the Sentencing Guidelines (the "terrorism enhancement"), the Court increases the offense level by 12 and assigns the defendant Criminal History Category VI "[i]f the offense is a felony that involved, or was intended to promote, a federal crime of terrorism."[4] Haouari contends that the Court should not have applied the terrorism enhancement to him. He has three grounds for his argument: (1) his conduct was not encompassed within the relevant Guidelines language, (2) application of the terrorism enhancement was unconstitutional under <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), and (3) the terrorism enhancement is now unconstitutional under <u>Blakely v. Washington</u>, 542 U.S. 296, 124

---

[4] This provision was identical in the 2001 Guidelines manual, which was in effect at the time of Haouari's sentencing.

S. Ct. 2531, 159 L. Ed. 2d 403 (2004), and <u>United States v.</u>
<u>Booker</u>, 543 U.S. 220, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005).

**A.   Section 3A1.4 and Haouari's Conspiracy Conviction**

Haouari claims that Section 3A1.4 should not apply to
him because he was not convicted of a "federal crime of
terrorism."  He contends that the jury in this case was never
charged with deciding if he had committed a "federal crime of
terrorism" and that the charges against him did not include that
allegation. (Pet. Mem. of Law at 7.)  Put more clearly, Haouari
was not convicted of violating 18 U.S.C. § 844(i) or 2339A, which
are statutorily-defined federal crimes of terrorism.  He was
convicted of conspiracy to commit those crimes.  The conspiracy
statute, 18 U.S.C. § 371, is not a statutorily-defined "federal
crime of terrorism."  Hence, Haouari argues, the Court erred in
applying the Section 3A1.4 terrorism enhancement to him.

The Government's first argument is that Haouari did not
raise this Guidelines claim in the course of his direct appeal.
Accordingly, the Government contends, he may press this claim in
the § 2255 context only if shows both "cause" for his failure to
raise the claim on appeal, as well as "prejudice" that would
follow from the Court's not considering the claim.  <u>See</u> <u>Campino</u>
<u>v. United States</u>, 968 F.2d 187, 190-91 (2d Cir. 1992) (Gov't Mem.
of Law at 28-29.)  The Court agrees.  Haouari makes no showing of
"cause" or "prejudice" to overcome the procedural bar to his

argument. For example, he mentions no supervening legal developments to excuse the failure to raise the issue on appeal. On this basis alone, the Court could reject Haouari's Section 3A1.4 argument.

Haouari appears to argue on page 3 of his reply brief that appellate counsel was ineffective for not raising the Section 3A1.4 issue to the Circuit. If this were so, Haouari could raise the issue in his § 2255 petition. <u>See United States v. Perez</u>, 129 F.3d 255, 261 (2d Cir. 1997). But in making this argument, Haouari makes no attempt to satisfy the <u>Strickland</u> test -- and herein lies the Government's second argument. Even if Haouari could show that appellate counsel's performance was substandard, he cannot show prejudice under <u>Strickland</u>. (Gov't Mem. of Law at 31-36.)

The terrorism enhancement was set forth in Haouari's Pre-Sentence Report. Haouari's trial counsel, Mr. Ollen, did not object to the application of the enhancement based on the language of Section 3A1.4(a). (<u>See</u> Ollen Ltr. to Court (Jan. 11, 2002), Ex. B to Gov't Mem. of Law). He objected only to the Probation Department's failure to factor to calculate a three-level decrease to the total offense level (36). <u>See</u> U.S.S.G. § 2X1.1(b)(2) (three-level decrease for uncompleted conspiracies). Mr. Ollen stated in his letter that he and the Government "agree[d] that level 33 is ... correct." At sentencing, the

Court stated on the record that "[t]he government and the defense agree with the revised pre-sentence report that, pursuant to Section 2X1.1(b) subdivision (2) of the sentencing guidelines, the corrected adjusted offense level for Count One is 33." (Sentencing Tr., Jan. 16, 2002, at 5). Level 33 included the 12-level terrorism enhancement under Section 3A1.4(a).

Under these circumstances, had Haouari pressed his Section 3A1.4 argument on appeal, the Circuit would have reviewed it under a "plain error" standard. See Fed. R. Crim. P. 52(b). The Supreme Court has explained the appropriate analysis:

> [B]efore an appellate court can correct an error not raised at trial, there must be (1) "error," (2) that is "plain," and (3) that "affects substantial rights." ... If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings.

Johnson v. United States, 520 U.S. 461, 466-67, 117 S. Ct. 1544, 1549, 137 L. Ed. 2d 718, 727 (1997) (quoting United States v. Olano, 507 U.S. 725, 732, 113 S. Ct. 1770, 1776, 123 L. Ed. 2d 508, 518 (1993)). "[A]n error is 'plain' if it is 'clear' or 'obvious' at the time of appellate consideration." United States v. Bruno, 383 F.3d 65, 79 (2d Cir. 2004) (citations omitted).

Upon reviewing the appropriate statutes, the Sentencing Guidelines and the sentencing transcript, the Court does not believe that it committed plain error in applying the terrorism enhancement. Section 3A1.4 of the Guidelines provides:

> (a) If the offense is a felony that involved, <u>or was intended to promote</u>, a federal crime of terrorism, increase by **12** levels; but if the resulting offense level is less than level **32**, increase to level **32**.

U.S.S.G. § 3A1.4(a) (emphasis added). The commentary at that time provided that "federal crime of terrorism" was defined by 18 U.S.C. § 2332b(g) (now § 2332b(g)(5)). The relevant statutory language is the same now as it was then:

> (5) the term "Federal crime of terrorism" means an offense that --
>
> > (A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and
> >
> > (B) is a violation of --
> >
> > > (i) section ... 844(i) (relating to arson and bombing of property used in interstate commerce), ... 2339A (relating to providing material support to terrorists) ....

18 U.S.C. § 2332b(g)(5). Count Two of the operative indictment charged Haouari with violating Section 2339A, a specifically enumerated federal crime of terrorism. The jury acquitted Haouari on this count. Count One charged Haouari under the conspiracy statute, 18 U.S.C. § 371, with conspiring to violate 18 U.S.C. §§ 2339A, 844(i) and 2332b(a)(1)(B). The Government withdrew the § 2332b(a)(1)(B) portion of the count. Although the conspiracy statute (18 U.S.C. § 371) itself is not a federal crime of terrorism listed in Section 2332b(g)(5)(B), the two

statutes underlying Haouari's conspiracy conviction are listed as federal crimes of terrorism.

Haouari thus was convicted, in the words of Section 3A1.4(a), of a felony offense "intended to promote" a federal crime of terrorism. Accordingly, the Court applied the terrorism enhancement to Count One, as specified in the Pre-Sentence Report. Haouari did not object to the enhancement either before or at sentencing. He does not allege that his trial counsel was ineffective for not objecting. He only contends that his appellate counsel was ineffective for not raising the issue on appeal. The Court is cognizant that the Second Circuit has yet to address the application of Section 3A1.4(a) to conspiracy convictions. At the time, the one circuit court that had passed on the issue held in a split decision that Section 3A1.4(a) was applicable to a conviction for conspiracy to commit a federal crime of terrorism. United States v. Graham, 275 F.3d 490, 516-19 (6th Cir. 2001), cert. denied, 535 U.S. 1026, 122 S. Ct. 1265, 152 L. Ed. 2d 636 (2002). While Haouari relies heavily on Judge Cohn's dissent in Graham, reliance on one dissent –- even one as thoughtful as Judge Cohn's -- is not enough to challenge this Court's application of Section 3A1.4(a) to his conviction.

Haouari also relies on United States v. Arnaout, 282 F. Supp. 2d 838 (N.D. Ill. 2003). There, the district judge called the Graham majority opinion a "questionable redrafting" of

Section 2332b(g)(5).  Id. at 845.  Arnaout, however, did not
involve a conspiracy conviction predicated on an enumerated
federal crime of terrorism.  Id.  Haouari's case, like Graham,
does.  After briefing was completed on the instant motion, the
Seventh Circuit reviewed Arnaout and held that a defendant need
not be convicted of an enumerated crime of terrorism for the
Section 3A1.4 enhancement to apply.  United States v. Arnaout,
431 F.3d 994, 1002 (7th Cir. 2005).

　　　　In summary, Haouari does not convince the Court that
his appellate counsel's performance was substandard or that he
was prejudiced at the Circuit level.  Moreover, appellate counsel
made a constitutional attack (albeit a different one) on Section
3A1.4.  In light of Graham, the only reported circuit decision on
the issue at the time, and in light of failure of trial counsel
to raise the issue at trial, appellate counsel may have believed
that he was leading with his best punch by challenging the
double-counting aspect of Section 3A1.4.  That appellate counsel
was unsuccessful does not mean he was ineffective.

####       B.    Haouari's Apprendi Argument

　　　　Haouari next claims that the Court's application of the
terrorism enhancement pushed his sentence to a higher Guidelines
range than would otherwise have been the case.  He contends that
the enhancement violates the Constitution because, as set forth
in Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S. Ct. 2348,

2362-63, 147 L. Ed. 2d 435, 455 (2000), "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to the jury, and proved beyond a reasonable doubt." (Pet. Mem. of Law at 7-8.)  Once again, the Government contends that Haouari is procedurally barred from raising this claim at the § 2255 stage because he did not do so on direct appeal. (Gov't Mem. of Law at 38.)  In his reply brief, Haouari claims that ineffective assistance of counsel (both at trial and on appeal) overcomes the bar. (Pet. Reply Mem. of Law at 7.)

Assuming arguendo that Haouari is not procedurally barred from making his Apprendi argument, his attorneys were not ineffective for not pressing the Apprendi claim.  This is so because the claim had no merit under Second Circuit law at the time.  In United States v. Garcia, 240 F.3d 180, 183-84 (2d Cir. 2001), the Second Circuit found that there was "nothing in the [Supreme] Court's holding in Apprendi or its explication of the holding that alters a sentencing judge's traditional authority to determine those facts relevant to selection of an appropriate sentence within the statutory maximum."  The Circuit explained that the relevant "statutory maximum" for Apprendi purposes was that set forth in Title 18 of the United States Code, not the maximum Guidelines sentence that would have been applied in absence of Guidelines enhancements.  See id. at 182-84.  This Court's sentence of Haouari comported with Garcia.  After

applying the enhancement, the Court fixed sentence within each of the relevant statutory maximums for all of the counts on which Haouari was convicted.[5]  There was no <u>Apprendi</u> violation.  To the extent that <u>Blakely v. Washington</u>, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004) and <u>United States v. Booker</u>, 543 U.S. 220, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005) call <u>Garcia</u> into question, these decisions do not apply retroactively to Haouari's conviction, which was final before <u>Blakely</u> and <u>Booker</u> were decided.  See <u>Guzman v. United States</u>, 404 F.3d 139, 141 (2d Cir. 2005); <u>Carmona v. United States</u>, 390 F.3d 200, 202 (2d Cir. 2004).[6]  Furthermore, "[c]ounsel is not required to forecast changes in the governing law."  <u>Mayo</u>, 13 F.3d at 533.

Haouari's <u>Apprendi</u> challenge is unsuccessful.  He cannot show under either prong of <u>Strickland</u> that his trial

---

[5] On Count One, Haouari received 5 years (the statutory maximum); on Count Three, 5 years (same); on Count Four, 3 years (the maximum at the time); on Count Five, 3 years (the maximum at the time); and on Count Six, 8 years (the maximum was 10 years). <u>See</u> 18 U.S.C. §§ 371, 1028(b)(2), 1029(c)(1)(A)(i).

[6] In <u>Blakely</u>, the Supreme Court held that "the 'statutory maximum' for <u>Apprendi</u> purposes is the maximum sentence a judge may impose <u>solely on the basis of the facts reflected in the jury verdict or admitted by the defendant</u>.... In other words, the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose <u>without</u> any additional findings." <u>Blakely</u>, 542 U.S. at 303-04, 124 S. Ct. at 2537, 159 L. Ed. 2d at 413-14.  The Court applied this holding in <u>Booker</u>, 543 U.S. at 232, 125 S. Ct. at 749, 160 L. Ed. 2d at 642-43.

counsel and appellate counsel were ineffective for failing to
challenge his sentence on Apprendi grounds.

## C. **Haouari's Booker Argument**

Haouari's final argument is that his sentence was
unconstitutional under Booker, cited supra. Both Haouari and the
Government grapple in their respective papers with the issue of
whether Booker applies retroactively to Haouari's sentence.
(Gov't Mem. of Law at 43-52; Pet. Reply Mem. of Law at 7-12.)
One week after Haouari submitted his reply brief on this § 2255
motion, the Second Circuit decided the question in Guzman, 404
F.3d at 141: "We hold that Booker is not retroactive: it does not
apply to cases on collateral review where the defendant's
conviction was final as of January 12, 2005, the date that Booker
issued." Haouari's conviction became final on May 27, 2003, the
date that the Supreme Court denied certiorari to the Second
Circuit on Meskini. Booker does not apply to Haouari's case.

## CONCLUSION

For the foregoing reasons, Haouari's § 2255 petition is
denied. The Clerk of the Court is directed to close this case.
**SO ORDERED.**

**Dated: New York, New York**
~~April~~ , 2006
$\mathfrak{May}$ 2

*John F. Keenan*

**JOHN F. KEENAN**
**United States District Judge**

31